# IN THE COURT OF APPEALS OF IOWA

No. 17-1193
Filed September 26, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**KENITH LEWIS,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Mark J. Smith, Judge.


        A defendant challenges his convictions for burglary in the first degree and sexual abuse in the third degree.  **AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Maria Ruhtenberg, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.


        Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**TABOR, Judge.**

The key question on appeal is whether a sexual assault nurse examiner impermissibly vouched for the credibility of the State's key witness when the nurse offered theories on "why a woman would not fight back or sustain injury during sexual abuse." Kenith Lewis—through appellate counsel—argues his trial attorney was ineffective for not lodging the proper objection to the nurse's testimony. In a supplemental brief, Lewis—representing himself—raises claims concerning trial counsel's failure to object to identification testimony, the sufficiency of the evidence, the constitutionality of his sentence, and jury selection. Because Lewis fails to show trial counsel's performance fell below professional standards, we reject his ineffective-assistance claims. Finding no other ground for reversal, we affirm Lewis's convictions and sentences for burglary in the first degree and sexual abuse in the third degree.

## I.     Facts and Prior Proceedings

The jury returned guilty verdicts based on the following facts. Tired after a rough week, E.B. fell asleep on the living room couch on a June night in 2015. She awoke early that morning, feeling "somebody on top" of her. The man put his arm over her mouth and whispered: "I don't want to hurt you, but I will." E.B. feared for her mother and teenage daughter who were asleep in the next room, as well as her two younger daughters who were sleeping upstairs.[1]

E.B. recalled the man lifting up her dress from behind and trying to force his penis inside her vagina, resulting in contact but not penetration. E.B. hoped to

---

[1] E.B.'s adult brother was also at the house.

move the intruder out of the house to protect her family members as he walked her to the kitchen and again tried to sexually assault her. He then took her to the bathroom where he pushed his penis inside her vagina and ejaculated. After the sex act, the intruder sprayed her with cleaning fluid and turned on the bathtub faucet, telling her to "wash really good down there." As he left, he said he'd be watching her and warned her not to call the police.

Despite his threats, E.B. called 911 and reported the crime to police. She described the intruder, but E.B. acknowledged she did not see his face because he was always behind her. She also went to the hospital where she met with Jessica Grier, a sexual assault nurse examiner (SANE).[2] Nurse Grier recalled E.B. was "tearful" and "withdrawn." Grier performed vaginal and perianal swabs to collect potential evidence of a sexual assault.

The next day, E.B. went to her neighborhood bar to do her own investigation. She testified:

> I felt like I needed to know who did this to me. I didn't think—I don't know what I was thinking. I walked into the bar. I said, Hey—I was like—you know, I gave him a description that I had of the man that walked in my house. And the bartender that was there gave me a name, and he said, "[T]his guy, it probably is him."

E.B. found a photograph on Facebook of the man named by the bartender, thought it was "definitely" her attacker, and reported the suspect to police. That suspect had an alibi and submitted a DNA sample that did not match the profile developed from the swabs taken as part of E.B.'s examination at the hospital.

---

[2] Grier testified that in addition to ensuring the patient is "medically stable," "in our emergency department as SANE nurses, we offer evidence collection, we offer photographic evidence collection, we offer STD prophylaxis, emergency contraception, and then we do do HIV and hepatitis testing as well."

But police soon developed another lead. The Division of Criminal Investigation lab notified detectives of a possible match for the DNA found in E.B.'s sex assault kit. The new suspect, Lewis, lived about two blocks from E.B. at the time of the assault. Lewis left his job at Oscar Mayer five days after the incident and moved to Minnesota. Six months after the assault, a detective showed E.B. a photograph of Lewis. E.B. told the detective: "[T]hat was him. That's the guy that raped me." The detective recalled E.B.'s reaction to seeing Lewis's photograph: "She immediately broke down and started crying; said she made a horrible mistake" in blaming the man named by the bartender. Police obtained a DNA sample from Lewis, which matched the profile developed from E.B.'s rape kit.

The State charged Lewis with burglary in the first degree, a class "B" felony, in violation of Iowa Code sections 713.1, 713.3(1)(d) (2015)[3] and sexual abuse in the third degree, a class "C" felony, in violation of section 709.4(1)(a).[4] The State later amended the trial information to add a sentencing enhancement under section 902.14[5] based on Lewis's two second-degree-sexual-abuse convictions

---

[3] Iowa Code section 713.1 provides:
> Any person, having the intent to commit a felony, assault or theft therein, who, having no right, license or privilege to do so, enters an occupied structure, such occupied structure not being open to the public, or who remains therein after it is closed to the public or after the person's right, license or privilege to be there has expired, or any person having such intent who breaks an occupied structure, commits burglary.

Burglary is enhanced to first degree if "the person performs or participates in a sex act with any person which would constitute sexual abuse under section 709.1." Iowa Code § 713.3(1)(d).

[4] Iowa Code section 709.4(1)(a) provides:
> A person commits sexual abuse in the third degree when the person performs a sex act under any of the following circumstances: . . . The act is done by force or against the will of the other person, whether or not the other person is the person's spouse or is cohabiting with the person.

[5] Iowa Code section 902.14(1) provides:

from 1991.  Lewis's first trial ended in a hung jury.  In his second trial, the jury found him guilty as charged and decided he was the same person who was convicted in 1991.  In July 2017, the district court sentenced Lewis to twenty-five years for second-degree burglary and life in prison for enhanced sexual abuse.  He now appeals.

## II.      Scope and Standards of Review

Because claims of ineffective assistance of counsel are rooted in the Sixth Amendment and article I, section 9 of the Iowa Constitution, we review them de novo.  *See State v. Henderson*, 908 N.W.2d 868, 874 (Iowa 2018).   We also apply a de novo standard of review to his ex post facto and public trial issues.  *See State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018); *State v. Schultzen*, 522 N.W.2d 833, 835–36 (Iowa 1994).  When considering Lewis's challenge to the sufficiency of the State's evidence, we review for errors at law.  *See State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018).

## III.     Analysis

## A.      Ineffective Assistance of Counsel

To prevail on his constitutional claim, Lewis must prove, by a preponderance of the evidence, trial counsel breached an essential duty resulting in actual prejudice.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  On the duty prong, Lewis must prove "counsel's representation fell below an objective

---

A person commits a class 'A' felony if the person commits a second or subsequent offense involving any combination of the following offenses:
   a. Sexual abuse in the second degree in violation of section 709.3.
   b. Sexual abuse in the third degree in violation of section 709.4.
   c. Lascivious acts with a child in violation of section 709.8, subsection 1, paragraph 'a' or 'b'.

standard of reasonableness" considering all the circumstances. *See id.* at 688.

On the prejudice prong, he must establish but for counsel's unprofessional errors,

a reasonable probability existed the outcome of the proceeding would have been

different. *See id.* at 694. Inability to satisfy either prong is fatal to Lewis's claim.

*See State v. Neitzel*, 801 N.W.2d 612, 624 (Iowa Ct. App. 2011). We often

preserve ineffective-assistance claims for postconviction proceedings, but we will

address them on direct appeal if the record allows. *Id.* We find the record here

adequate to address both claims of ineffective assistance of trial counsel.

### 1.     Expert Testimony of Nurse

Lewis's appellate attorney focuses on trial counsel's handling of Grier's

testimony. At issue is the following exchange from the nurse's direct testimony:

> Q: Based on your training, education, and experience, is there a generally-accepted theory, again, based on case studies, that why a woman would not fight back or sustain injury during a sexual abuse?
>
> [Defense Counsel]: Your Honor, I would just renew my objection[6] I think that's outside the scope of her training and everything.
>
> THE COURT: Well, I think she can answer that question. Go ahead.
>
> A: So I don't have specific case studies that I can share with you here today off the top of my head; however, in my training, especially when we focus on trauma-informed care, it is often that the brain cortex just kind of shuts down. Fear kind of drives everything. And in my training that I went to back in October of 2014, I actually sat in and listened to an interview of a sexual assault victim where the fear drove the way that she just completely shut down because she was afraid that if she was to yell, if she was to scream, if she was to fight, that she would not only be putting herself in danger, but her child that was just in the room next door. So you can hear interviews from victims in the past, and it's just from, studies have shown, that once fear drives, you have your flight-or-fight, which is driven by your epinephrine and norepinephrine, so you're either going to fight or you're going to, like I said, the whole fight-or-

---

[6] Defense counsel's original objection was "calls for speculation."

flight concept, that you're going to flight, I guess you could put it, and your body just kind of shuts down. Your brain isn't connecting because you're so afraid. There's a lot of women that just—their emotions, their feeling—the feeling from here to their toes isn't connecting because they're afraid that if they were to fight, that they're putting themselves in danger, as well as anybody else that could be around them.

Lewis argues the State impermissibly used the nurse's expert testimony to bolster E.B.'s credibility on the non-consensual nature of the sex act. He asserts: "It was apparent that the State perceived a weakness in the victim's story that the sex was against her will because she did not yell for help when there were other adults in the house." The State counters that Grier did not impermissibly vouch for E.B.'s truthfulness because her testimony did not address E.B.'s specific reaction to the assault.

The admissibility of expert opinion testimony is governed by Iowa Rule of Evidence 5.702 and a recent trilogy of cases from our supreme court interpreting that rule. *See, e.g.*, *State v. Brown*, 856 N.W.2d 685, 689 (Iowa 2014); *State v. Dudley*, 856 N.W.2d 668, 676–77 (Iowa 2014); *State v. Jaquez*, 856 N.W.2d 663, 666 (Iowa 2014). Those cases involved experts commenting—directly or indirectly—on the credibility of accusers in child sexual abuse prosecutions. *Brown*, 856 N.W.2d at 689 (holding expert impermissibly vouched for witness's credibility by opining that "investigation [was] clearly warranted"); *Dudley*, 856 N.W.2d at 677 (holding psychologist indirectly vouched for child's credibility when expert testified child's symptoms were consistent with sexual abuse trauma); *Jaquez*, 856 N.W.2d at 665 (concluding expert indirectly vouched for witness in stating child's demeanor was consistent with being repeatedly traumatized). The problem in all three cases was the appearance of a scientific "stamp of approval"

bestowed upon the version of events offered by the child witness, "even though an expert cannot accurately opine when a witness is telling the truth." *Dudley*, 856 N.W.2d at 677; *accord Brown*, 856 N.W.2d at 689; *Jaquez*, 856 N.W.2d at 665.

What happened here was not impermissible vouching. Nurse Grier did not testify regarding any statements made by E.B. at the hospital or at trial; in fact, the record does not indicate Grier was even present for E.B.'s testimony. Rather Grier explained the impact fear commonly has on a victim's reaction to being sexually assaulted and the "fight-or-flight" concept triggered by traumatic situations. Experts may testify regarding the "typical symptoms exhibited by a person after being traumatized." *See Dudley*, 856 N.W.2d at 676 (citing *State v. Gettier,* 438 N.W.2d 1, 6 (Iowa 1989)). Such opinion evidence is admissible as long as it avoids any direct comment on the experience of the witness at issue and only generally addresses victims of sexual abuse. *Id.* Because the nurse's testimony did not amount to an improper opinion on E.B.'s credibility, trial counsel had no impetus to object on different grounds. *See State v. Ray*, 516 N.W.2d 863, 866 (Iowa 1994) ("It is axiomatic that ineffectiveness of counsel may not be predicated on the filing of a meritless motion.").

### 2. Single-Photo Identification Process

In his supplemental brief, Lewis argues trial counsel should have objected to the detective's testimony recounting E.B.'s positive identification of her attacker from a single photograph. Lewis contends the procedure was impermissibly suggestive under *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972), and counsel should have moved to exclude her identification at trial. We find counsel appropriately handled the identification issue. Counsel vigorously cross examined

E.B. about the fact she did not see her attacker's face, her original faulty identification of a different suspect, and the six-month delay before the detectives showed her the photograph of Lewis. Counsel also cross examined the detective about E.B.'s emotional state and the timing or her positive identification of Lewis from the single photograph. Counsel's efforts fell within the normal range of competency. *See State v. Artzer*, 609 N.W.2d 526, 531 (Iowa 2000) (reiterating defendants are not entitled to "perfect representation").

Lewis also fails to show he was prejudiced by counsel's omission. The State presented strong evidence Lewis committed the crimes—even without E.B.'s positive identification. In June 2015, Lewis lived and worked just a few blocks from E.B.'s residence, and her attacker told her that he admired her when he was walking by the house. Lewis was not at work the night of the crimes. He moved to Minnesota about a week later. And most significantly, Lewis's DNA in the form of seminal fluid with spermatozoa was found in and around E.B.'s vagina. Lewis cannot show a reasonable probability of a different outcome had trial counsel objected to her in-court identification.

## B. Sufficiency of the Evidence

Lewis contends the State did not present sufficient evidence to prove him guilty of first-degree burglary and third-degree sexual abuse. When examining his contention, we decide if the jury's verdicts are supported by substantial evidence in the record, viewing the evidence in the light most favorable to the State. *See Kelso-Christy*, 911 N.W.2d at 666. To qualify as "substantial," the evidence must be capable of convincing rational jurors that Lewis was guilty beyond a reasonable doubt. *See id.*

Lewis raises piecemeal complaints about the strength of the State's case—mentioning police testimony about E.B.'s description of her attacker, officers' attempts to collect fingerprints, alleged inconsistencies between E.B.'s testimony at the first and second trials, and E.B.'s identification of him from "a lone photograph." He also asserts the presence of his DNA "is not evidence of a crime."

The credibility of E.B.'s identification and any inconsistencies in the evidence were for the jury to sort out. *See State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005). Given the totality of the evidence, the jurors reasonably rejected any inference the sex act—established by the presence of Lewis's DNA on the swabs collected from E.B.—was consensual. The State's evidence revealed E.B. did not know Lewis and was shaken by his presence in her home in the early morning hours. Similarly, the jury was free to believe E.B.'s testimony that Lewis did not have right, license or privilege to enter her home before committing the sex act. We find substantial evidence in the record to support Lewis's convictions.

### C. Ex Post Facto Challenge to Sentence

Our federal and state constitutions both forbid ex post facto laws. U.S. Const. art. I, § 10; Iowa Const. art. I, § 21; *See also Lopez*, 907 N.W.2d at 122. Those provisions prevent courts from imposing new or harsher punishment enacted by the legislature after the defendant already committed the conduct. *See State v. Seering*, 701 N.W.2d 655, 666 (Iowa 2005).

Lewis claims his life sentence under Iowa Code section 902.14 violates the ex post facto clauses. This kind of illegal sentence challenge may be raised at any time. *See Lopez*, 907 N.W.2d at 122. The recidivist statute at issue went into effect on July 1, 2005, but allows the use of previous offenses which occurred

before that date. *See* Iowa Code § 902.14(2). Section 902.14 does not punish Lewis for his 1991 convictions, but instead as a repeat offender for the June 2015 sexual abuse of E.B. *See State v. Stoen*, 596 N.W.2d 504, 507 (Iowa 1999) ("[T]he enhancement of punishment is for the *pending* offense, not the previous offenses."). Accordingly, Lewis has not suffered an ex post facto violation.

### D. Jury Selection

The United States Supreme Court has recognized a right of access to jury selection proceedings in a criminal trial. *Press-Enterprise v. Superior Court*, 464 U.S. 501, 510 (1984) ("[T]he primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the *voir dire* which promotes fairness.").[7] A party may overcome the presumption of openness by showing "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.*

In his supplemental brief, Lewis argues the district court violated his right to a public trial by allowing limited voir dire of potential jurors in chambers. Lewis did not object to this process at trial and does not raise the claim as ineffective assistance of counsel on appeal. Accordingly, the claim is not properly presented for our review. *See State v. Biddle*, 652 N.W.2d 191, 203 (Iowa 2002) ("The rule of error preservation applies with equal strength to constitutional issues.").

---

[7] While a majority of the Supreme Court determined voir dire was included within the protections provided by the public trial provision of the Sixth Amendment, a special concurrence explained the right of access being upheld was under the First Amendment. *Press-Enterprise*, 464 U.S. at 516 (Stevens, J., concurring).

**IV.    Conclusion**

We reject appellate counsel's claim concerning trial counsel's failure to object to expert testimony.  We also reject the ineffective-assistance-of-counsel claim raised by Lewis in his supplemental brief concerning identification testimony. In addition, we decline to grant relief on his remaining self-represented claims.

**AFFIRMED.**